88 So.2d 338

## LIFE and CASUALTY INSURANCE COMPANY

v.

## Fred BURKE, Jr.

### 6 Div. 912.

Court of Appeals of Alabama.

Aug. 30, 1955.

Rehearing Denied Nov. 1, 1955.

Bankhead & Petree, Jasper, for appellant.

Selman & Beaird, Jasper, for appellee.

PRICE, Judge.

Appellee instituted this proceeding against appellant in the Walker County Circuit Court to recover benefits under a policy of insurance issued February 25, 1951,

insuring plaintiff against the permanent loss of sight or limb as a direct and proximate result of disease or injury sustained after the date of issue of the policy.

The plaintiff alleged that he suffered the loss of the sight of one eye due to a disease contracted after the date of the policy or by injury sustained on August 31, 1951. Trial resulted in verdict and judgment in favor of appellee.

Appellant insists that it was entitled to the affirmative charge, with hypothesis, on the theory that the evidence failed to show that plaintiff suffered the permanent loss of the sight of an eye as a direct and proximate result of an injury sustained or disease contracted after the effective date of the policy.

The plaintiff testified that on August 31, 1951, he received an injury to his left eye, which resulted in the loss of sight in that eye. To the question, "Just tell in your own words how that injury came about," he replied, "I was working in the mine, and got awful hot, and I bathed my face in cold water and took an awful headache. I went to the Doctor at the mines, my eye begin to swell and I couldn't see, and the Doctor sent me to the Doctor in town."

He testified further that his eye remained swollen three or four days; that prior to August 31 he could see well out of that eye; that he had never worn glasses; that his eyes had never hurt nor been swollen before; to his knowledge he had never had any disease that affected his eyes. He stated that he was fixing the rock chain and got very hot and went to where the spray was washing the coal and "got my hands full of water, and just put it on my face." This was clean water, the same as that used by the men in the wash room, and he did not pick up any water after it hit the coal, and did not get any in his eyes that he knew of. Two or three minutes later his head and eye commenced to pain.

He went to see a doctor a few hours after the alleged injury, and this doctor referred him to Dr. Simmons, but he was unable to see Dr. Simmons until the next morning.

Plaintiff introduced the deposition of Dr. J. Kelly Robinson, who testified that he was an optometrist at Sylacauga, Alabama; that he examined the plaintiff's eyes on November 17, 1951, and found no useful vision in his left eye.

As a witness for defendant, Dr. J. T. Simmons, the doctor who first examined the plaintiff's eyes the morning after the alleged injury, testified that plaintiff came to his office stating he couldn't see out of his left eye; plaintiff was under the impression that this was due to some injury and mentioned that he had become hot, dashed cold water in his face, and thereafter couldn't see out of his left eye. On examination the right eye appeared almost normal. Plaintiff said he couldn't see light when held in front of his left eye. The pupils of both eyes reacted to light held in front of them, which is not ordinarily the case when there is no vision.

He saw and examined plaintiff twice more in September and five times in October. Plaintiff couldn't read any letters on the chart or see hand movements or count fingers with his left eye. The doctor saw a scar across the front of the left eye, "a small scar that I couldn't say how long it had been there, although in my opinion it had been there quite a while, a month, or a year, or two or three years."

The eye was not red or swollen when he came in on the first occasion and had no unusual appearance other than the corneal scar that wouldn't be noticed without a careful examination.

Dr. Simmons testified that he did not think a corneal scar of that type could be caused by a man dashing water on his face. He had never known of loss of vision resulting from such an incident and did not believe plaintiff's loss of vision was due to that circumstance. He further stated that scar tissue is healed tissue and that in his opinion if the plaintiff had injured his eye the preceding day it would not have looked as it did; that he prescribed no treatment, but suggested that plaintiff see another doctor.

Defendant also introduced the deposition of Dr. Alston Callahan, a Birmingham

physician. The record shows an agreement between the attorneys for both parties that plaintiff consulted Dr. Callahan at the request of the insurance company.

Dr. Callahan testified he specializes in the treatment of eye diseases and injuries; he is the head of the Eye Department of the Medical College of Alabama. He examined plaintiff's eyes on August 27, 1952. Plaintiff told him he lost the sight of his left eye on August 31, 1951, and did not know the reason for the loss of vision; that he had had no injury, that he got very hot and his vision went out suddenly. The doctor's examination showed that plaintiff had vision in the left eye only for the ability to see light; attempt to improve the vision in the left eye with a spectacle lens was not satisfactory. The slit-lamp microscope showed a very small corneal scar in the left eye. The pupils reacted equally and promptly to light. Examination in great detail of the left vitreous retina and optic nerve showed no evidence of injury; the fundus of both eyes was normal; examination did not show a ruptured vessel, but a year had elapsed and a ruptured vessel could have healed and the blood clot could have been absorbed without leaving a scar, and if such hemorrhage had occurred without leaving a scar, the vision should have been restored to normal.

The doctor stated he found evidence of loss of vision in plaintiff's eye, but in his opinion the loss of vision could hardly be caused by an injury since no sign of an injury could be found. The very small scar noted on the cornea would at most have reduced vision to 20/30 and not to light perception only; since all structures of the eye are properly transparent, eye physicians are nearly always able to determine the exact cause of the reduction of vision, especially when the vision is seriously reduced; that he saw no indication of injuries or diseases sustained by plaintiff since February 21, 1951, which would have caused his loss of vision.

To the question as to whether or not plaintiff's dashing of cold water onto his face when he was in an overheated condition could, in his opinion, have caused loss of vision in his eye, Dr. Callahan replied, "Certainly not." He stated it was difficult to believe that it could have aggravated a pre-existing diseased condition or pre-existing injury suffered by the eye, since there was no sign of any pre-existing condition.

To cross interrogatories propounded to him this witness stated that upon his examination plaintiff said he only could see light with his left eye, but the pupil reacted well to light and the eye saw light well; that the vision in the left eye could not be corrected with glasses so as to give eyesight in that eye. He only examined plaintiff one time.

In Grabove v. Mutual Ben. Health & Accident Ass'n, 241 Ala. 88, 1 So.2d 297, 299, the court said:

"* * * we have held the definite testimony of members of the medical profession, expert in their line, based upon facts within the knowledge and discernment of men of learning and experience, when not in conflict, nor opposed by other evidence, does call for the affirmative charge, with hypothesis. Commonwealth Life Ins. Co. v. Harmon, 228 Ala. 377, 153 So. 755; Aetna Life Ins. Co. v. Norfleet, 232 Ala. 599, 169 So. 225; New York Life Ins. Co. v. Horton, 235 Ala. 626, 180 So. 277; First Nat. Bank of Birmingham v. Equitable Life Assur. Soc. of United States, 225 Ala. 586, 144 So. 451."

See also Provident Life & Acc. Ins. Co. of Chattanooga, Tenn. v. Downey, 242 Ala. 482, 7 So.2d 17.

We are of the opinion the testimony, which we have set out at length, when measured by the rule of law just stated, clearly entitled the defendant to the affirmative charge, as requested, and for its refusal the judgment must be reversed.

Reversed and remanded.